## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| **DAVID DICKERSON** | **PETITIONER** |
| **v.** | **CIVIL ACTION NO. 3:21-CV-465-TBM** |
| **BURL CAIN,** *et al.* | **RESPONDENTS** |

### Memorandum Opinion and Order

David Dickerson was previously found guilty of capital murder. His conduct included stalking, stabbing, and shooting Paula Hamilton (his ex-girlfriend); plus pouring gasoline on her and setting her home on fire. After all of this, Paula's home exploded, and Dickerson left her there to die. Somehow, though, Paula was still alive when she was pulled from the fiery home by two strangers. But she ultimately died before more help could arrive.

Dickerson has spent more than ten years litigating this case in state court. This has included numerous pretrial hearings, the jury trial, many post-trial proceedings, and three separate Mississippi Supreme Court appeals. Much of the litigation has centered on whether Dickerson was competent to be tried and whether Dickerson had the intellectual capacity to be sentenced to death. Every court at every stage has answered these questions affirmatively. And Dickerson has never really denied that he committed the acts described above. While Dickerson has now brought this federal habeas proceeding, his request is for this Court to allow him to go back to state court for more proceedings. But for the reasons set forth in this opinion, the law prohibits Dickerson from going back to state court for more litigation.

Dickerson asserted several claims in his initial Petition for Writ of Habeas Corpus [11] which he contends have not been presented to a state court. Accordingly, he filed a Motion to Stay

and Abey [36] this case, while he exhausts his state-court remedies. After the parties briefed the Motion to Stay [36], the Court questioned whether Dickerson had, in fact, exhausted said claims and ordered [48] the parties to provide supplemental briefing. They did so, and Dickerson filed a Motion for Leave to File [52] an amended petition to delineate his current claims from those already asserted in state court. The Court granted the motion, Dickerson filed an Amended Petition for Writ of Habeas Corpus [57], and the parties did not submit any additional briefing in light of the amended pleading.

As explained below, the claims asserted in Grounds 1, 2, and 4 of the Amended Petition [57] were either exhausted by presentation to the state court or they are technically exhausted because state relief is no longer available. Moreover, Dickerson has not demonstrated good cause for a stay, and his unexhausted claims are plainly meritless. Therefore, pursuant to *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), the Court **denies** Dickerson's Motion to Stay and Abey [36].

## I. BACKGROUND

### A.    *Paula Hamilton's Killing[1]*

In 2010, Paula Hamilton filed for a restraining order against her ex-boyfriend, David Dickerson. Paula claimed that Dickerson was stalking her and their sixteen-year-old daughter, and a hearing was set on these allegations.

On the morning of the hearing, Paula and her family were home getting everyone ready for school. A man was seen in the yard, and Paula went to investigate.  It was Dickerson. When Paula approached him, he shot and stabbed her. While severely injured, Paula survived this first attack.

---

[1] This information is taken from the applicable Mississippi Supreme Court opinions and trial court record.

The next attack came when their daughter went outside, as she had heard the gunshots ring out. Dickerson punched his daughter in the face, and Paula convinced the daughter to flee. Somehow Paula also briefly escaped Dickerson's violence, rushed back inside the home, and locked the door. Dickerson doggedly pursued her. He burst through the door and threatened to shoot their daughter. Paula was able to sacrifice herself and also persuade her aunt and daughter to run away – which they did.

Dickerson then poured gasoline on Paula, set the home on fire, and left. A couple of individuals happened to be driving by the home when it exploded. They rushed to the scene and pulled Paula from the fire while she was still breathing. But Paula died before any further help could arrive.

### B.      State Court Proceedings

A grand jury indicted Dickerson for the capital murder of Paula Hamilton, for arson, and for armed robbery. *Dickerson v. State ("Dickerson I")*, 175 So. 3d 8, 13 (Miss. 2015). Dickerson was represented in the trial court by a team of attorneys from the Office of the State Public Defender who have substantial expertise and experience in representing criminal defendants in capital cases. He filed a motion seeking a "determination of his competency to stand trial and as to whether he was intellectually disabled" within the meaning of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).[2] *Id.* The trial court appointed a forensic psychologist, Dr. Criss Lott, to evaluate him. *See* Trial Record Vol. 2 [32-2], at 151.

---

[2] In *Atkins*, the Supreme Court held that execution of the intellectually disabled constitutes cruel and unusual punishment prohibited by the Eighth Amendment, but it explicitly left it to the States to develop a method of determining whether one is intellectually disabled. 536 U.S. at 317. However, in *Hall v. Florida*, 572 U.S. 701, 722-24, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014), the Supreme Court held that a Florida law which rigidly defined intellectual disability solely by reference to IQ score likewise violated the Eighth Amendment because, among other reasons, it did not comport with the professional consensus of medical experts. Accordingly, the Mississippi Supreme Court has adopted "two complementary definitions of intellectual disability that were cited with approval in *Atkins*." *Chase v.*

Lott determined that "[a]lthough [Dickerson's] intellectual score falls within the range of mental retardation, . . . his adaptive deficits were not markedly impaired and he would not meet the criteria for mental retardation." *See* Trial Record Vol. 3 [32-3], at 48. However, Lott was initially unable to determine whether Dickerson was competent to stand trial. *Id.* at 48-49. He stated that Dickerson had "a good factual understanding of the nature and purpose of the charges against him, but he appears to lack the capacity to confer rationally with his attorney." *Id.* at 48. Lott was "unable to determine the nature and severity of [Dickerson's] mental illness," and he believed Dickerson was "exaggerating his psychological problems." *Id.* Accordingly, he concluded that "further observation [was] needed to determine the nature of Mr. Dickerson's mental illness and to rule out the possibility of malingering . . . ." *Id.* at 49.

Upon Lott's recommendation, experts from the Mississippi State Hospital at Whitfield observed Dickerson for two months. *Dickerson I*, 175 So. 3d at 13. The trial court ordered the facility to determine whether Dickerson was 1) "competent to stand trial and if not whether there is a reasonable probability that he can be restored to competency in the foreseeable future," or 2) intellectually disabled. *See* Trial Record Vol. 3 [32-3], at 69. Dr. Robert Storer, a forensic psychologist, and Dr. Reb McMichael, a forensic psychiatrist, evaluated him. *See* Trial Record Vol. 4 [32-4], at 22-26. Preliminarily, they noted that the testing indicated Dickerson "was giving poor effort, feigning memory deficits, and attempting to exaggerate and/or fabricate psychiatric symptoms." *Id.* at 24. Although Dickerson claimed to be "experiencing auditory, visual, and tactile

---

*State*, 171 So. 3d 463, 467 (Miss. 2015). Each approved definition was promulgated by a medical organization and incorporates both intellectual functioning (IQ score) and limitations in various adaptive skill areas, such as communication, self-care, health and safety, self-direction, leisure, and work. *Id.* at 467-68. Mississippi's trial courts are tasked with making this fact-heavy determination "after receiving evidence presented by the defendant and the State." *Chase v. State*, 873 So. 2d 1013, 1028 (Miss. 2004).

hallucinations," he "never demonstrated typical behavioral indications of these symptoms. For example, he never appeared to be distracted or to be responding to internal stimuli, never demonstrated disorganized thought processes, and never demonstrated confusion or difficulty expressing himself outside of formal evaluations." *Id.* at 23-24. He was "selective regarding who he would and would not interact with," and when he interacted with other patients, he "demonstrated no significant impairments in his interpersonal functioning attributable to a major mental illness." *Id.* at 24.

Although previous testing showed that Dickerson's IQ was low enough to meet the first criterion for intellectual disability, Storer and McMichael were unable to conduct their own IQ testing "due to [Dickerson's] feigning cognitive deficits and exaggerating and/or fabricating psychiatric symptoms." *Id.* at 24. They relied on "records and personal interviews" to assess Dickerson's adaptive functioning, the second criterion for intellectual disability. *Id.* at 24-25. Their review of these sources, "failed to identify significant deficits in Mr. Dickerson's adaptive functioning in conceptual, social, or practical domains." *Id.* at 26. They specifically noted that Dickerson had obtained a "GED with scores that indicate essentially average academic achievement," that he had been consistently employed from 1987 to the time of his arrest, and that he had "started up, and to some degree, maintained his own business repairing and moving house trailers." *Id.* at 25. In summary, although Dickerson possessed sub-average intelligence, he had no significant deficits in adaptive functioning. *Id.* at 26. Accordingly, Storer and McMichael concluded that he was "not mentally retarded . . . ." *Id.* at 23.

As for Dickerson's competency to stand trial, they determined that he "did not demonstrate any credible symptoms of a major mental illness or of a mental defect which would be

the foundation for deficits in his competence-related abilities." *Id.* at 23. Indeed, as noted above, Storer and McMichael's testing indicated that he "was giving poor effort, feigning memory deficits, and attempting to exaggerate and/or fabricate psychiatric symptoms." *Id.* at 24.

At a pretrial hearing on Dickerson's motion, the State offered testimony from all three experts (Lott, Storer, and McMichael). Lott testified that while Dickerson's low IQ score was "consistent with the possibility that his abilities may fall in the mentally retarded or developmentally disabled range," his work and life history demonstrated that his adaptive behavior "fell within the low average range," and he "exhibited [no] major adaptive deficits through early adulthood." Trial Record Vol. 6 [32-6], at 85-86.

As for Dickerson's competency to stand trial, Lott testified that Dickerson "is competent to proceed, . . . [and] is capable of making a rational and factual assessment of his legal situation and proceeding rationally with his attorney . . . ." *Id.* at 77. Lott acknowledged that he initially was unable to determine whether Dickerson was competent to proceed. *Id.* However, after receiving the reports from the State Hospital's two-month observation of Dickerson, Lott concluded that Dickerson was "competent to proceed, . . . capable of making a rational and factual assessment of his legal situation and proceeding rationally with his attorney." *Id.*[3] Lott also acknowledged that Dickerson had been diagnosed with various mental disorders in the past, including paranoid schizophrenia, for which he had been prescribed anti-psychotic medications and received inpatient

---

[3] In an affidavit obtained recently by Dickerson's habeas counsel for this proceeding, Lott stated that his "opinion pretrial was that Mr. Dickerson had a good factual understanding of the nature and purpose of the charges against him, but he appeared to lack the capacity to confer rationally with his attorney." Exhibit 52A to Amended Petition [57-9], at 2. This is not a complete record of Lott's prior testimony. As recounted above, Lott was initially unable to determine whether Dickerson was competent because "he appeared to be exaggerating his psychological problems." Trial Record Vol. 3 [32-3], at 48. After two months of observation at Whitfield, Lott concluded that Dickerson was competent to stand trial and simply malingering symptoms of mental illness. Trial Record Vol. 6 [32-6], at 77-78, 92-93, 100-02.

and outpatient treatment. *Id.* at 78. He diagnosed Dickerson with a "cognitive disorder," evidenced by deficits in his "executive functioning," which implicates his "ability to anticipate, to plan, to problem solve." *Id.* at 89. In layman's terms, Lott said Dickerson exhibited poor "judgment" and had trouble delaying gratification or learning from his mistakes. *Id.* at 89-90.

Finally, Lott maintained that Dickerson was uncooperative, *id.* at 77-78, and malingering his symptoms of mental illness. *Id.* at 92-93, 100-02. Although Dickerson reported "psychotic symptoms," Lott did not observe any during his initial observation. *Id.* at 92-93. Lott also noted that Dickerson behaved differently on the morning of the hearing than he had during Lott's evaluation, becoming "obstinate and uncooperative." *Id.* at 93, 100-01. Lott concluded that "it's not due to a severe mental illness, but rather due to the character traits that are adversely affecting him." *Id.* at 101.

Dr. Storer testified that "Dickerson did not have any significant deficits in his competence-related abilities attributable to major mental illness or major defect." *Id.* at 103-04. He said that Dickerson was able to understand the proceedings and his charges, and that he was able to assist his attorney. *Id.* at 104. Storer did not disagree with Lott's diagnosis of a cognitive disorder. *Id.* at 106. However, he noted that Dickerson was uncooperative in attempts to conduct testing during his hospitalization. *Id.* at 107. Accordingly, he diagnosed Dickerson as malingering and exhibiting a personality disorder with "schizotypal paranoid and narcissistic features." *Id.* at 110. He noted that this was "qualitatively different" than a diagnosis of schizophrenia, a major mental illness, in that Dickerson exhibited no "psychotic symptoms." *Id.* at 111. As for intellectual disability, Storer agreed with Lott's evaluation of Dickerson's IQ, but he provided no testimony as to Dickerson's adaptive functioning. *Id.* at 105-06.

Dr. McMichael testified that Dickerson "has the capacity to understand his legal situation and confer rationally with defense counsel if he chooses." *Id.* at 115. He said that Dickerson has "a personality disorder," and that he "didn't exhibit any objective signs of [a major mental illness] in over two months of inpatient hospitalization." *Id.* He noted that Dickerson "deliberately did not" cooperate with those evaluating him, and that he exhibited no "credible objective signs of PTSD" to hospital staff. *Id.* at 116. McMichael did not address intellectual disability. *Id.* at 113-20.

In summary, the expert testimony provided at the hearing demonstrated that Dickerson had the capacity to confer with counsel, that he was mentally competent to stand trial, and that he was not intellectually disabled. *Dickerson I*, 175 So. 3d at 14; *see also* Trial Record Vol. 6 [32-6], at 77-78, 85-86, 103-06, 115-16. Dickerson's counsel thoroughly cross-examined the State's experts, but he presented no evidence to rebut their testimony. *Dickerson I*, 175 So. 3d at 14; Trial Record Volume 6 [32-6], at 120.

The state trial court ultimately agreed that Dickerson was competent to stand trial. *Dickerson*, 175 So. 3d at 17. In July 2012, a jury found Dickerson guilty on all three charges (capital murder, arson, and armed robbery) and recommended the death penalty. The trial court judge sentenced Dickerson to death and denied his motion for a new trial.

Dickerson appealed. On appeal, he argued that the trial court erred in concluding that he was competent to stand trial. *See* Brief of Appellant at 9-28, *Dickerson v. State*, 2012-DP-01500-SCT (Miss. Jan. 6, 2014). But the Mississippi Supreme Court found that the trial court's decision "was not manifestly against the overwhelming weight of the evidence," noting the testimony provided by multiple experts. *Dickerson I*, 175 So. 3d at 17.

Dickerson also argued that "his history of mental illness precludes imposition of the death penalty," likening mental illness to the "diminished personal culpability" of juveniles and the mentally disabled, citing *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), and *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). *See* Brief of Appellant at 28-49, *Dickerson v. State*, 2012-DP-01500-SCT (Miss. Jan. 6, 2014). The Mississippi Supreme Court declined to extend the holdings of *Atkins* and *Roper* to the mentally ill, citing numerous decisions by the Fifth Circuit. *Dickerson I*, 175 So. 3d at 18 (citing *Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006); *In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005)). Dickerson did not raise any arguments on appeal related to his trial counsel's performance, his trial counsel's alleged conflict of interest, the jury pool make-up, or alleged *Brady* violations. *See* Brief of Appellant at ii-iii, *Dickerson v. State*, 2012-DP-01500-SCT (Miss. Jan. 6, 2014).

Dickerson filed a petition for a writ of certiorari with the United States Supreme Court, but it was denied. *Dickerson v. Mississippi*, 578 U.S. 947, 136 S. Ct. 1713, 194 L. Ed. 2d 813 (2016).

Dickerson then sought leave from the Mississippi Supreme Court to file a petition for post-conviction relief. On the same day, he filed a motion to hold his post-conviction proceeding in abeyance, arguing that he was not competent to proceed. The Mississippi Supreme Court granted the motion and remanded the case to the trial court for a determination of Dickerson's competency to proceed on post-conviction. *See* En Banc Order, *Dickerson v. State*, 2015-DR-00954-SCT (Miss. Aug. 10, 2017).

The trial court held another competency hearing, but it ultimately ruled the same way it had before Dickerson's trial, finding that he was competent to proceed. *Dickerson v. State ("Dickerson II")*, 291 So. 3d 344, 347-48 (Miss. 2020).

Dickerson appealed this decision to the Mississippi Supreme Court. On appeal, he argued that the trial court's determination that he was competent to proceed in post-conviction was against the weight of the evidence. *See* Brief of Appellant at 3-22, *Dickerson v. State*, 2018-CA-00710-SCT (Miss. Nov. 27, 2018). The Mississippi Supreme Court disagreed, finding that "the trial court's determination that Dickerson is competent to proceed in post-conviction collateral relief proceedings was not manifestly against the overwhelming weight of the evidence." *Dickerson II*, 291 So. 3d at 354. Thus, Dickerson's post-conviction proceeding moved forward.

As he had done in the trial court, Dickerson argued that he is "intellectually disabled as defined by the Court in *Atkins* . . . and thus . . . ineligible for the death penalty." *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 5-15, *Dickerson v. State*, 2015-DR-00954-SCT (Miss. Oct. 14, 2016). Dickerson also argued that his trial counsel "was ineffective in failing to properly litigate the intellectual disability issue at trial and on appeal," and that his trial counsel failed to conduct a thorough mitigation[4] investigation. *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 27-28, *Dickerson v. State*, 2015-DR-00954-SCT (Miss. Oct. 14, 2016). He did not offer some of the specific ineffective assistance arguments that he has presented here. Likewise, he did not present his

---

[4] "Upon conviction . . . of capital murder or other capital offense," Mississippi courts "conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment." MISS. CODE ANN. § 99-19-101(1). "In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances" outlined in the statute. MISS. CODE ANN. § 99-19-101(1), (5), (6). "For the jury to impose a sentence of death, it must unanimously find in writing . . . [t]hat sufficient aggravating circumstances exist . . . [and t]hat there are insufficient mitigating circumstances . . . ." MISS. CODE ANN. § 99-19-101(3).

arguments that 1) the trial court violated his right to a jury representing a fair cross-section of the community, 2) the prosecution failed to disclose exculpatory evidence in its possession, 3) his trial counsel had a conflict of interest, or 4) his trial counsel failed to question jurors about their relationships with law enforcement.

The Mississippi Supreme Court observed that much of the material Dickerson relied upon in arguing that he was intellectually disabled and, therefore, ineligible for the death penalty had been "already considered during [his] trial proceedings and the subsequent direct appeal or [was] cumulative of evidence considered in those proceedings." *Dickerson v. State ("Dickerson III")*, 357 So. 3d 1010, 1020 (Miss. 2021). Moreover, the Mississippi Supreme Court noted that Dickerson's newly retained experts failed to address his alleged malingering. *Id.* at 1021. Ultimately, it concluded that the intellectual-disability claim was "barred and/or Dickerson fail[ed] to present a substantial showing of the denial of a state or federal right." *Id.*

As for Dickerson's general claim that trial counsel was ineffective in failing to properly litigate the intellectual disability issue at trial and on appeal, the Mississippi Supreme Court held that he failed to "present a viable claim of deficient performance," given the consideration of the intellectual disability issue before the trial, during the trial, after the trial, and on direct appeal. *Id.* at 1023. It also held that Dickerson failed to show actual prejudice, as "the intellectual-disability evidence" was either already considered in prior proceedings or was cumulative. *Id.* at 1024. Therefore, the Mississippi Supreme Court concluded that Dickerson failed to prove that he received ineffective assistance of counsel in this regard. *Id.* It also rejected arguments that Dickerson's counsel provided ineffective assistance with regard to *Daubert* challenges of the State's experts and the pretrial mitigation investigation. *Id.* at 1024-25, 1027-28.

C.      *Issues Before the Court*

Dickerson then initiated this capital habeas proceeding. He filed a Motion to Stay and Abey [36] these proceedings while he exhausts his state court remedies as to certain claims by asserting them in a successive petition for post-conviction relief in the Mississippi Supreme Court. Before the Court addresses the Motion to Stay [36], it must determine whether Dickerson has, in fact, already exhausted some of these claims, which requires it to ascertain whether "the substance of the federal claim [has been] fairly presented to the highest state court on direct appeal or in post-conviction proceedings . . . ." *Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013).

After the Court determines which claims have not been exhausted, it must address Dickerson's Motion to Stay [36], which requires it to determine if he has demonstrated "good cause for his failure to exhaust," that "his unexhausted claims are potentially meritorious," and that "there is no indication that [he] engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278. If the Court "determines that stay and abeyance is inappropriate," the Court should allow Dickerson "to delete [those] unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair [his] right to federal relief." *Id.*

## II. EXHAUSTION

First, the Court must determine whether Dickerson has exhausted some of his claims. Dickerson filed a Motion to Stay and Abey [36] these proceedings while he exhausts his state court remedies by pursuing a successive petition for post-conviction relief in the Mississippi Supreme Court. After receiving the parties' briefing and examining Dickerson's Petition [11], Motion to Stay [36], and briefing before the Mississippi Supreme Court on direct appeal[5] and post-conviction

---

[5] *See* Brief of Appellant, *Dickerson v. State*, No. 2012-DP-1500-SCT (Miss. Jan. 6, 2014).

relief,[6] the Court questioned whether Dickerson had, in fact, exhausted the claims presented in Grounds 1, 2, and 4 of the Petition [11]. The Court ordered [48] the parties to provide supplemental briefing [50, 51]. They did so. Dickerson subsequently filed an Amended Petition [57], and the Court offered the parties another chance to provide supplemental briefing. They did not do so. The exhaustion issue is, therefore, ripe for review.

"The point of AEDPA[7] . . . is to require prisoners first to exhaust state court remedies before seeking federal relief . . . ." *Broadnax v. Lumpkin*, 987 F.3d 400, 406 (5th Cir. 2021). Therefore, a federal habeas petitioner "must exhaust all claims in state court prior to requesting federal collateral relief." *Smith v. Quarterman*, 515 F.3d 392, 400 (5th Cir. 2008); *see also* 28 U.S.C. § 2254(b)(1)(A). The Court has discretion to address the question of exhaustion *sua sponte*. *See, e.g. United States v. Castro*, 30 F.4th 240, 246 (5th Cir. 2022) (citing *Granberry v. Greer*, 481 U.S. 129, 133, 107 S. Ct. 1671, 95 L. Ed. 2d 119 (1987)).

AEDPA's "exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in post-conviction proceedings, even if the state court fails to address the federal claim." *Johnson*, 712 F.3d at 231. A federal claim "is fairly presented when the petitioner asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was

---

[6] *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016).

[7] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed limits on this Court's ability to grant habeas relief. The law was designed to "curb the abuse of the statutory writ of habeas corpus, and to address the acute problems of unnecessary delay and abuse in capital cases," *Graham v. Johnson*, 168 F.3d 762, 764 (5th Cir. 1999), and to "further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000).

made." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982) (internal citation omitted). Rather, "the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his current assertions." *Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006).

New evidence that "supplements" a claim previously presented to the state courts does not create a new, unexhausted habeas claim. *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003). Rather, "new evidence that fundamentally alters the legal claim or places the claim in a significantly different legal posture can render it a new claim that was not adjudicated on the merits by the state court." *Nelson v. Davis*, 952 F.3d 651, 671-72 (5th Cir. 2020).

"The determination of whether additional evidence fundamentally alters or merely supplements the state petition is necessarily case and fact specific." *Sells v. Stephens*, 536 F. App'x 483, 491 (5th Cir. 2013). "[M]erely putting a claim in a stronger evidentiary posture is not enough" to make it a new, unexhausted claim. *Nelson*, 952 F.3d at 671; *see also Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). But the Fifth Circuit has "consistently refused to consider a habeas petitioner's claims exhausted where the petitioner provides substantial amounts of new evidence, the claims and allegations before the state court were conclusory and undeveloped, the petitioner offers new evidence that could not have been derived from the state court record, and the petitioner offers new evidence which alters the nature of his claims." *Sells*, 536 F. App'x at 491. In other words, "substantial new evidence rising to the level of a '180 degree turn' renders a claim unexhausted." *Anderson*, 338 F.3d at 389 n. 26 (quoting *Demarest v. Price*, 130 F.3d 922, 936 (10th Cir. 1997)).

14

Additionally, a claim may be "technically exhausted" if "state relief is no longer available, without regard to whether the claims were actually exhausted by presentation to the state courts . . . ." *Jones v. Jones*, 163 F.3d 285, 296 (5th Cir. 1998); *see also Coleman v. Thompson*, 501 U.S. 722, 732, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). If a "petitioner allowed his state law remedies to lapse without presenting his claims to the state courts . . . , there is no substantive difference between nonexhaustion and procedural default." *Jones*, 163 F.3d at 296 (punctuation omitted). In both cases, the habeas petitioner "deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732. For example, if a habeas petitioner failed to present his claims in state court and the claims would now be procedurally barred as an untimely or successive petition – as is the case here – then he "meets the technical requirements for exhaustion" because "there are no state remedies any longer available to him." *Id.* (punctuation omitted). Such technically exhausted habeas claims are procedurally defaulted. *Jones*, 163 F.3d at 296; *see also Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). And "[f]ederal habeas relief may be granted on a procedurally defaulted claim only if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Jones*, 163 F.3d at 296 (punctuation omitted).

## A.      *Ground 1 – Intellectual Disability*

In Ground 1 of the Amended Petition [57], Dickerson argues that he is intellectually disabled and, therefore, ineligible for the death penalty, and that his trial counsel provided ineffective assistance by failing to properly investigate and present evidence of his intellectual disability or seek appropriate expert assistance. *See* Amended Petition [57], at 9-27. Likewise,

Dickerson argued to the Mississippi Supreme Court on post-conviction relief that he is ineligible for the death penalty because he is intellectually disabled, and that his trial counsel provided ineffective assistance by failing to request a hearing on the issue of intellectual disability or to properly litigate the issue at trial or on appeal. *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 8-18, 30, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). The Mississippi Supreme Court addressed both claims when it denied his petition for post-conviction relief. *Dickerson III*, 357 So. 3d at 1018-21, 1023-25.

Dickerson argues that although the claims raised in Ground 1 of the Amended Petition are "superficially similar" to those asserted in state court, he brings forward new facts that "fundamentally alter the claim that was presented to the state court." Accordingly, he contends that the claims were not exhausted. He also argues that the ineffective-assistance claim asserted in Ground 1 differs from the one raised in state court, in that on post-conviction, he limited the claim to his counsel's alleged failure to seek a hearing on the issue of intellectual disability. But here he claims that counsel was ineffective for failing to properly investigate the issue, present evidence of intellectual disability, and seek appropriate expert assistance. As explained below, the post-conviction argument was not as limited as Dickerson claims.

In response to Dickerson's arguments, the State argues that Dickerson exhausted the *Atkins* claim by asserting it in his initial post-conviction proceeding. The State contends that the ineffective assistance claim is technically exhausted because it would be procedurally barred in state court.

1.   *Ground 1a – Intellectual Disability*

In Dickerson's initial state post-conviction proceeding, he claimed that he was "intellectually disabled . . . , and thus . . . ineligible for the death penalty." *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 5, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). He further argued that he has "subaverage intellectual functioning," citing the evaluation performed by Dr. Criss Lott, Lott's testimony from the pretrial competency hearing, records from the State Hospital's pretrial observation, and Dr. Robert Storer's testimony from the pretrial competency hearing. *Id.* at 8-9. Dickerson also argued that he has "significant deficits in adaptive functioning," citing his school records; testimony from a former employer provided at sentencing; and affidavits from former employers, friends, and family members. *Id.* at 9-13. Dickerson then argued that these deficits manifested before he was eighteen years old, citing his school records and affidavits from his brother and a friend. *Id.* at 13-15. Finally, in that same proceeding, Dickerson presented affidavits from Dr. Marc Zimmerman, a psychologist, and Dr. Benjamin Root, a psychiatrist. *Id.* at 15. Zimmerman stated that he believed Dickerson would be found intellectually disabled with additional testing, and Root stated that he believed additional testing should be conducted to determine whether Dickerson is intellectually disabled. *Id.* at 15-16.

In this federal habeas case, Dickerson likewise claims that he is intellectually disabled and, therefore, ineligible for the death penalty. Amended Petition [57], at 9-27. He argues that he has subaverage intellectual functioning, citing testimony from Dr. Lott and Dr. Storer in the state court's pretrial hearing and sentencing, as well as a new sworn declaration from Dr. Lott. *Id.* at 12-13; Exhibit 52a to Amended Petition [57-9]. Dickerson also argues that he has significant deficits

in adaptive functioning, citing the affidavits previously provided in the state post-conviction proceedings; new affidavits from friends and family;[8] Dr. Lott's evaluation from the state court's pretrial hearing; and testimony provided at sentencing by his friends, family members, a mitigation specialist, and at least one former employer. Amended Petition [57], at 13-25. Finally, Dickerson argues that his adaptive deficits manifested before he was eighteen years old, citing his school records and the testimony of his friends and family. *Id.* at 25-26.

The only difference between Dickerson's *Atkins* claim from state court and his *Atkins* claim here is that he supplemented the federal habeas claim with additional evidence. He provided new affidavits from friends and family that expand on testimony and topics previously considered in the state-court proceeding relevant to his adaptive functioning. For example, in state court, Dickerson provided a three-page affidavit from his brother, Troy Dickerson. *See* Exhibit 13 to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). There, Troy generally stated that they had a "rough life growing up," and that they were removed from their mother's home when David was around fifteen years old. *Id.* at 1. Troy explained that their step-father was a "heavy drinker," and that he "mistreated David worse than he did anyone else in our family." *Id.* According to Troy, they "were very poor," lacking running water, indoor plumbing, and enough food to eat. *Id.* at 2. He said that David had to be told how to perform simple tasks, such as picking peas, and that he "did not have the abilities to think things through." *Id.* at 1. "He would often talk about things that were not true," *id.*, and he did not know how to count money or make change. *Id.* at 2. He said David was "slow in classes" and dropped out of school in the ninth grade. *Id.* at 3.

---

[8] *See* Exhibits 44-47 to Amended Petition [57-1, 57-2, 57-3, 57-4].

Here, Dickerson presented another eight-page affidavit from Troy. *See* Exhibit 45 to Amended Petition [57-2]. Troy addressed the same topics he discussed in the state-court affidavit, but he provided more facts and examples of David's alleged adaptive deficits. For instance, he provided more details about their difficult home life. *Id.* at 1-3. He described social difficulties that David experienced as a youth. *Id.* at 4, 7. He told about incidents illustrating David's inability to hold a job or make a living. *Id.* at 4-6. Finally, he provided several examples of life skills that David allegedly never developed, such as learning to swim, paying bills, properly riding a bicycle, cooking, or properly choosing his own wardrobe. *Id.* at 7. The other new affidavits from David Dickerson's friends and family similarly expand on issues already addressed in the information provided to the state court. *See* Exhibits 44, 46, 47 to Amended Petition [57-1, 57-3, 57-4].

The supplemental affidavits from Dickerson's family and friends do not qualify as "substantial new evidence rising to the level of a '180 degree turn' [that] renders a claim unexhausted." *Anderson*, 338 F.3d at 389 n. 26. First, the evidence is not new in that it was available to Petitioner at any time during his criminal proceedings. Indeed, Celina Sills, Troy Dickerson, Dina Montgomery, and Don Wilson each stated that if anyone had contacted them at the time of trial, they would have provided the same testimony. *See* Exhibit 44 to Amended Petition [57-1], at 6; Exhibit 45 to Amended Petition [57-2], at 8; Exhibit 46 to Amended Petition [57-3], at 4; Exhibit 47 to Amended Petition [57-4], at 2. Second, the supplemental affidavits do not fundamentally alter the nature of Petitioner's claim – much less create a 180-degree turn in the claim's strength – in that they do not provide any substantial new information, but merely expand on the testimony and topics already considered by the state court. *See Ward v. Stephens*, 777 F.3d 250, 258-59 (5th Cir.

19

2015), *abrogated on other grounds by Ayestas v. Davis*, --- U.S --- , 138 S. Ct. 1080, 1092-93, 200 L. Ed. 2d 376 (2018).

Dickerson also supplemented the claim with an updated affidavit from Dr. Criss Lott, who now believes that "further evaluation of Mr. Dickerson's adaptive deficits is recommended." Exhibit 52A to Amended Petition [57-9], at 4-5. He said, "The information contained in those additional sworn statements raises concerns about the reliability of Mr. Dickerson's self-reporting on the [adaptive functioning test] due to an attempt to mask his disability." *Id.* at 4. Lott also noted "a very mitigating document from Chancery Court of Copiah County, Youth Court Division that described the poverty, trauma and abuse" Dickerson endured as a child. *Id.* at 5.

In contrast, in his initial state-court evaluation, Lott stated: "Although [Dickerson's] intellectual score falls within the range of mental retardation, it is my opinion that his adaptive deficits were not markedly impaired and he would not meet the criterial for mental retardation." *See* Exhibit 18 to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 47, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). Likewise, in the trial court's pretrial hearing, Lott testified that Dickerson's adaptive behavior scores "fell within the low average range." Trial Record Vol. 6 [32-6], at 86. Although Dickerson exhibited "significant deficits in cognitive function" like ADHD symptoms, *id.* at 88, he had "worked as a clerk in several stores, had ran the cash register, had been functioning independently, had been responsible for his needs, both financial and personal, and there was no indication that he had exhibited any major adaptive deficits through early adulthood." *Id.* at 86. During the sentencing phase of trial, Lott testified that although Dickerson had "some cognitive deficits and other social skill deficits, in

terms of interpersonal relationships," he did not "meet the criteria" under *Atkins* for an intellectual disability. Trial Record Vol. 9 [32-9], at 101, 110.

In preparing his initial report for the state trial court, Dr. Lott considered numerous confidential memoranda drafted by Dickerson's trial counsel describing their visits with Dickerson's friends and family. *See* Exhibit 18 to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 5-6, 16-19, 30-35, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). Lott formed his initial opinions without either set of affidavits at issue – those first submitted to the state court on post-conviction or those submitted for the first time to this federal habeas court – as neither existed at the time of trial. However, as noted above, the same information was always available to Dickerson's attorneys. *See* Exhibit 44 to Amended Petition [57-1], at 6; Exhibit 45 to Amended Petition [57-2], at 8; Exhibit 46 to Amended Petition [57-3], at 4; Exhibit 47 to Amended Petition [57-4], at 2. And Lott formed his earlier opinions after observing Dickerson for two months at Whitfield. *Dickerson I*, 175 So. 3d at 13; Trial Record Vol. 6 [32-6], at 77-78.

The only specific fact cited by Lott in support of the new affidavit is that Don Wilson, Dickerson's former manager at Piggly Wiggly, claims that Dickerson could not work the cash register when he was employed there, contradicting Dickerson's earlier claim that he had done so. *Id.* at 4. Beyond this issue, Lott cannot remember "meeting with trial counsel or obtaining additional collateral information after [he] completed [his] report" over ten years ago. *Id.* at 3. In contrast, when Lott produced his opinions for the state trial court, he was very familiar with

Dickerson because he had just spent two months evaluating him and had previously evaluated him.[9]

Regardless, Lott's supplemental opinion does not create a 180-degree turn in the *Atkins* claim's strength, in that Lott does not now believe that Dickerson was incompetent to stand trial, or that he is intellectually disabled. Rather, Lott now states that "further evaluation of Mr. Dickerson's adaptive deficits is recommended," Exhibit 52A to Amended Petition [57-9], at 4-5, despite Lott having already evaluated Dickerson on three separate occasions before his trial, including two months of inpatient evaluation. At best, Lott is slightly hedging on his previous opinion – provided under oath at a pretrial hearing – rather than fundamentally altering its nature, strength, or relevance to Dickerson's *Atkins* claim. *See Morris*, 413 F.3d at 494-96.

Dickerson also supplemented his claim with a declaration from Dr. Daniel Grant, a psychologist. *See* Exhibit 49 to Amended Petition [57-6]. Grant opined that "neither the [initial] evaluation by Dr. Lott or the Mississippi State Hospital conformed to prevailing professional standards necessary to make a reliable assessment of intellectual disability or mental retardation." *Id.* at 4. According to him, "neither expert conducted an assessment of adaptive functioning, which was necessary given that Mr. Dickerson's IQ scores indicated subaverage general intellectual functioning," and "[n]either Dr. Lott or Dr. Storer and Dr. MicMichael sought reliable

---

[9] In July 1997, Lott evaluated Dickerson for the County Court of Copiah County, Mississippi, after Dickerson had been arrested several times for stalking women in his community. Trial Record Vol. 3 [32-3], at 22-26. Lott interviewed Paula Hamilton in 1997, and she told him that Dickerson had "physically accosted her on several occasions." *Id.* at 23. At that time, Lott interviewed several other witnesses, and he administered several psychological tests on Dickerson. *Id.* at 22-25. In 1997, Lott concluded that Dickerson was "at moderate risk for some type of future dangerous behavior," and he recommended that he "be required to seek counseling . . . and be monitored at least monthly for the next 12-24 months." *Id.* at 26.

information to confirm onset during the developmental period." *Id.*[10] Grant concluded that "there are significant indications that Mr. David Dickerson has a combined IQ that places him in the intellectually disabled range and that he has limitations in adaptive behavior." *Id.* at 8. Accordingly, Grant believes "that upon further evaluation Mr. Dickerson will be found intellectually disabled under the" proper criteria. *Id.*

Just like Lott's supplemental opinion, Grant's affidavit does not create a 180-degree turn in the claim's strength, in that Grant conspicuously stops short of saying that Dickerson is intellectually disabled. Rather, Grant – like Lott – recommends further evaluation, *id.*, despite Dickerson having received two months of inpatient evaluation before trial. Moreover, as set forth in more detail below, the Fifth Circuit has held that a new expert's affidavit presented for the purpose of impeaching another expert's IQ testing merely supplements an *Atkins* claim, rather than fundamentally altering it. *Lewis v. Quarterman*, 541 F.3d 280, 285 (5th Cir. 2008). Therefore, Grant's testimony does not fundamentally alter Dickerson's *Atkins* claim. *See Morris*, 413 F.3d at 494-96.

A number of cases support this Court's conclusion that the information from family and friends, Dr. Lott, and Dr. Grant supplement Dickerson's claim, rather than fundamentally alter it. For instance, in *Ward v. Stephens*, the Fifth Circuit held that a petitioner's "new evidence" merely "supplemented and duplicated evidence that had already been presented to the state court." 777 F.3d at 258-59. There, the state-court record included "extensive testimony about Ward's mental-

---

[10] Lott did, in fact, evaluate Dickerson's adaptive functioning in his initial assessment for the state trial court, concluding that his "adaptive deficits were not markedly impaired." *See* Exhibit 18 to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 47, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). In forming this opinion, Lott considered statements from Dickerson's family members, friends, and co-workers. *Id.* at 32-35. He also administered the ABAS-II test, which "assesses an individual's daily and functional adaptive skills." *Id.* at 41.

illness history and family [from] the penalty phase" of trial, and "affidavits of a school psychologist, his best friend, and his neighbors" from the state post-conviction proceeding. *Id.* at 258-59. In comparison, Ward presented the federal habeas court with "affidavits and declarations from additional new witnesses: family friends, family members, and Ward's mother's coworkers," arguing "that Ward was inaccurately diagnosed with antisocial personality disorder; that Ward was raised in poverty and in an abusive family environment; and that his parents had failed to pursue proper treatment, ignoring the advice of mental-health professionals." *Id.* at 258-59. The Fifth Circuit concluded that Ward's "argument on federal habeas varies only slightly," and that his new evidence "arguably place[d] his IAC claim in a stronger evidentiary position, but it [did] not place the claim in a 'significantly different legal posture.'" *Id.* at 259. Therefore, the claim had been exhausted. *Id.*

Likewise, in *Morris v. Dretke*, the Fifth Circuit held that new expert affidavits were not enough to fundamentally alter an *Atkins* claim that had previously been asserted in state court. 413 F.3 at 494-96. There, Morris presented the state court with "pertinent, if not conclusive, evidence of low intellectual functioning and adaptive deficits, from childhood on," *id.* at 495, and he described in detail what an expert was prepared to testify to, although he did not include the expert's affidavit. *Id.* at 493. Morris's state-court briefing was "remarkably detailed in both fact and law," including citation to clinical standards for determining intellectual disability. *Id.* at 496. The key element missing from his state-court materials was "IQ evidence." *Id.* On federal habeas review, Morris presented new evidence of his IQ score and adaptive deficits, as well as expert affidavits interpreting the IQ testing results. *Id.* at 496. The Fifth Circuit held that although this new evidence "factually bolstered his sole *Atkins* claim," it did not render the claim

"fundamentally altered and thus unexhausted." *Id.* at 495. Rather, the "new evidence merely supplemented [his] claims." *Id.*

Also, in *Lewis v. Quarterman*, the Fifth Circuit held that a new expert's affidavit simply supplemented an *Atkins* claim. 541 F.3d at 285. There, Lewis submitted a new expert's affidavit for the purpose of demonstrating that another expert had improperly administered an IQ test. *Id.* at 284-85. The Fifth Circuit noted that Lewis had "presented claims of mental retardation [in state court], relying upon affidavits and testimony by health professionals." *Id.* at 285. Although he had not presented the new affidavit in state court, he had argued that the IQ test had been improperly administered, and he had offered other expert testimony to that effect. *Id.* at 285. Accordingly, the Fifth Circuit found that the new affidavit supplemented the *Atkins* claim, rather than fundamentally altering it. *Id.*

Finally, in *Winston v. Kelly*, the Fourth Circuit held that new evidence of an IQ test did not fundamentally alter a petitioner's claim that counsel provided ineffective assistance in presenting an *Atkins* claim to the state court. 592 F.3d 535, 550 (4th Cir. 2010). There, the court noted that "whether new evidence fundamentally alters a claim does not depend on whether it makes the claim stronger." *Id.* Rather, the "key [was] whether [the petitioner] offered some evidence in state court to support the factual claim that he possesses significantly sub-average intellectual functioning as measured by a standardized test." *Id.* In state court, the petitioner had presented evidence that a state agency had diagnosed him as intellectually disabled based on testing, and that he had received a previous "IQ score that should be considered below 70 due to the Flynn effect . . . ." *Id.* Therefore, the new IQ score did not place the claim in a "significantly different and

stronger" posture than it had been before, and it did not "fundamentally alter" the claim. *Id.* at 551.

Considering these cases[11] and the record, the Court concludes that Dickerson's *Atkins* claim was not "conclusory and undeveloped" in state court. *Sells*, 536 F. App'x at 491. Although Dickerson has bolstered the claim with additional evidence, he has not altered it so much that it is a "180-degree turn" from the way he presented it in state court. *Anderson*, 338 F.3d at 389 n. 26. The claims are based on the same legal theory, and Dickerson supported the state-court *Atkins* claim with substantial evidence, including the testimony of friends, family, former employers, and experts. He has done the same here. The supplemental evidence – the family affidavits, Lott's affidavit, and Grant's affidavit – just expands on factual issues already explored in state court. Moreover, neither Lott nor Grant now attest that Dickerson is, in fact, intellectually disabled. Instead, they just say more evaluation is needed, despite Dickerson having received two months of inpatient evaluation before trial. Finally, Grant's chief criticism of the experts' findings is that they did not assess Dickerson's adaptive functioning, but Lott did, in fact, assess Dickerson's adaptive functioning, as explained above. For all these reasons, the Court finds that Dickerson supplemented the claim, rather than fundamentally altered it, and the *Atkins* claim asserted in Ground 1 was exhausted.

---

[11] *See also Richey v. Bradshaw*, 498 F.3d 344, 353 (6th Cir. 2007) (where the "legal basis for [the petitioner's] claim has remained constant, and where the [new facts] merely substantiate it," the claim had not "been so fundamentally altered from that presented to the state court as to preclude" review); *Hampton v. Cain*, No. 5:12-CV-2646, 2019 WL 13447143, at *17 (W.D. La. Feb. 27, 2019) ("The additional evidence offered in support of the petitioner's disproportionality claim strengthens, rather than fundamentally alters that claim. Thus, the fact that these allegations were not raised on direct appeal does not render the claim unexhausted."); *Woodfox v. Cain*, Civil No. 06-789-JJB, 2012 WL 1676691, at *4-*5 (M.D. La. May 14, 2012) (new expert report did not "fundamentally alter" a claim, but was a "textbook case of supplementing").

*2.  Ground 1b – Ineffective Assistance Related to Intellectual Disability*

In his state court post-conviction petition, Dickerson asserted that his counsel was "ineffective in failing to properly litigate the intellectual disability issue at trial and on appeal," and for "fail[ing] to request a hearing on intellectual disability . . . ." *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 30, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). Specifically, he claimed that his trial counsel "were ineffective due in part to a failure to discover and put on the evidence regarding Mr. Dickerson's adaptive functioning deficits." *See* Petitioner's Rebuttal of State's Response to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 3-4, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Sept. 25, 2020). Dickerson argued that his trial counsel's "investigation fell short of constitutionally acceptable standards," and that they should have called additional witnesses to establish that he "suffer[ed] from significant adaptive functioning deficits." *Id.* at 7. He asserted that his "repeated failed attempts to perform on various jobs[ and] his failures to successfully do meaningful work even when the tasks were simple[ ] prove that he meets the criteria for deficits in adaptive functioning." *Id.* at 4. In support of this argument, Dickerson provided an affidavit from his brother (previously discussed by the Court) which addressed his inability to perform simple tasks on his own, inability to perform more than one task at a time, propensity to be a "loner," inability to count money, habit of wetting the bed in early childhood, and poor academic performance. *Id.* at 5-6.

Related to this issue, Dickerson also argued on post-conviction that his attorney should have challenged the State's experts as to his competency to stand trial. *Id.* at 24, 27. He asserted that, "[a]t a minimum, trial counsel had a duty to conduct a *Daubert* hearing to ensure" that the

State's experts "met the minimum standard for admissibility." *Id.* at 27. Likewise, Dickerson argued that his trial counsel failed to investigate and put on all witnesses available to provide mitigation testimony on his behalf, *id.* at 27-30, and although Dickerson did not submit an *Atkins* claim on direct appeal, he raised the issue of intellectual disability as a mitigation factor. *See* Brief of Appellant at 59, *Dickerson I*, No. 2012-DP-1500-SCT (Miss. Jan. 6, 2014).

In this federal habeas case, Dickerson asserted that his trial counsel "was ineffective for failing to properly investigate and present evidence establishing [his] intellectual disability," failing to seek "appropriate expert assistance in assessing adaptive functioning deficits," and failing to retain "an expert who could have assisted in cross-examining court-appointed experts about the pronounced shortcomings of their evaluations." Amended Petition [57], at 27. In other words, Dickerson still claims that his trial counsel provided ineffective assistance by not sufficiently investigating and supporting his mitigation case with evidence that he is intellectually disabled, but here he made more specific allegations. He also provided additional evidence, in the form of new affidavits from friends and family and a declaration from Dr. Daniel Grant, as the Court discussed above.

The State argues that this claim is technically exhausted. As explained above, "claims are considered to be 'technically' exhausted when state relief is no longer available, without regard to whether the claims were actually exhausted by presentation to the state courts . . . ." *Jones*, 163 F.3d at 296. The State contends that post-conviction relief is no longer available for the ineffective-assistance claim asserted in Ground 1b because it would be barred by the statute of limitations and barred as a successive petition. *See* MISS. CODE ANN. §§ 99-39-5(2)(b), 99-39-27(9).

In capital cases, Mississippi law requires motions for post-conviction relief to be filed "within one (1) year after conviction." MISS. CODE ANN. § 99-39-5(2)(b). The Mississippi Supreme Court has construed this provision to require filing within one year of the issuance of the mandate upon the completion of appellate review. *See, e.g. Puckett v. State*, 834 So. 2d 676, 677-78 (Miss. 2002). The mandate issued on Dickerson's direct appeal on October 15, 2015. Therefore, unless there is an applicable exception to the statute of limitations, any post-conviction petition filed at this point would be time-barred.

Moreover, the denial of a petition for post-conviction relief "shall be a bar to a second or successive application" for post-conviction relief. MISS. CODE ANN. § 99-39-27(9). The Mississippi Supreme Court rejected Dickerson's first petition for post-conviction relief on April 8, 2021. Therefore, unless there is an applicable exception to the Mississippi Uniform Post-Conviction Collateral Relief Act's ("MUPCCRA's") bar on successive petitions, any successive post-conviction petition would be barred.

Dickerson argues that he is entitled to present this claim – that his trial counsel provided ineffective assistance on the *Atkins* claim in certain ways he did not previously argue to the state court – to the Mississippi Supreme Court because his post-conviction counsel provided ineffective assistance by omitting it from his first petition. In *Grayson v. State*, the Mississippi Supreme Court held that "PCR petitioners who are under a sentence of death do have a right to the effective assistance of PCR counsel." 118 So. 3d 118, 126 (Miss. 2013). The court held that "errors affecting fundamental constitutional rights . . . are excepted from procedural bars which would otherwise prevent their consideration." *Howell v. State*, 358 So. 3d 613, 615 (Miss. 2023) (describing the basis of *Grayson*'s holding). But in *Howell v. State*, the Mississippi Supreme Court clarified that the

MUPCCRA's three-year statute of limitations is a "substantive, legislatively enacted law and not procedural," and, therefore, it cannot be overruled by the "judicially-crafted fundamental-rights exception." *Id.* at 615-17. The Mississippi Supreme Court recently provided further clarification, specifically addressing whether *Howell* overruled *Grayson. See Ronk v. State*, --- So. 3d ---, 2024 WL 131639 (Miss. Jan. 11, 2024). It held: "Because *Howell* supports that no judicially crafted exception – even for fundamental rights – applies to the MUPCCRA's substantive, constitutional bars, we overrule *Grayson* to the extent it crafted an exception for ineffective-assistance-of-post-conviction-counsel claims in death-penalty cases." *Id.* at *4.

Therefore, Dickerson would not be permitted to present this claim in a successive petition to the Mississippi Supreme Court. It would be time-barred, MISS. CODE ANN. § 99-39-5(2)(b), and barred as a successive petition. MISS. CODE ANN. § 99-39-27(9). To the extent *Grayson* provided an exception to these bars, it has now been explicitly overruled by the Mississippi Supreme Court. *Ronk*, 2024 WL 131639 at *4. Accordingly, the Court concludes that the Mississippi Supreme Court would hold that post-conviction relief is no longer available for the ineffective-assistance claim asserted in Ground 1b because it is procedurally barred, and Petitioner has not argued that any other exception to the statutory bars applies. Therefore, the claim is technically exhausted. *Jones*, 163 F.3d at 296.[12]

---

[12] As noted above, technically exhausted claims are procedurally defaulted, but the Court can still grant habeas relief on a procedurally defaulted claim if the petitioner demonstrates cause and prejudice or that the Court's failure to consider the claim will result in a "fundamental miscarriage of justice." *Jones*, 163 F.3d at 296. These issues are beyond the scope of the present motion and have not been briefed by the parties.

**B.**      *Ground 2 – Competency to Stand Trial*

In Ground 2, Dickerson claims that he was not competent to stand trial. *See* Amended Petition [57], at 36-38. On direct appeal, he also argued that he was not competent to stand trial, *see* Brief of Appellant at 22-41, *Dickerson v. State*, No. 2012-DP-1500 (Miss. Jan. 6, 2014), and the Mississippi Supreme Court rejected the claim. *Dickerson I*, 175 So. 3d at 15-17.

Dickerson further claims in Ground 2 that his trial counsel provided ineffective assistance by failing to adequately investigate and challenge his competency to stand trial. Amended Petition [57], at 38-42. In his petition for post-conviction relief, Dickerson argued that his trial counsel provided ineffective assistance by failing to properly litigate the intellectual disability issue and, more specifically, challenge the state's expert witnesses on the question of competency. *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 30, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). The Mississippi Supreme Court addressed this issue on post-conviction relief. *Dickerson III*, 357 So. 3d at 1023-25.

Dickerson first argues that both claims asserted in Ground 2 of his Amended Petition are not factually exhausted because he has new evidence that "fundamentally alters" the claims. He also argues that the ineffective-assistance claim is not exhausted because he now faults trial counsel for failing to conduct an adequate investigation prior to the competency evaluation and failing to select a competent, independent expert, whereas on post-conviction he only faulted trial counsel for failing to challenge the state expert's findings regarding his competency to stand trial.

In response, the State argues that Dickerson exhausted the claim that the trial court erred in finding him competent to stand trial by asserting it on direct appeal. The State also argues that

the ineffective-assistance claim asserted in Ground 2 is technically exhausted because it would be procedurally barred in state court.

1.   *Ground 2a – Competency*

On direct appeal, Dickerson argued that the trial court erred in concluding that he was competent to stand trial. *See* Brief of Appellant at 22-41, *Dickerson v. State*, No. 2012-DP-1500 (Miss. Jan. 6, 2014). He claimed that he was not competent to stand trial because his deficits in executive functioning and history of mental illness impeded his ability to rationally understand and make decisions about the proceedings and to rationally communicate with his trial counsel. *Id.* at 24. In support of the claim, Dickerson cited his past diagnoses and treatment of mental illness; the observations, information, and testing relied upon by Dr. Criss Lott in evaluating his competency for trial;[13] and his low IQ scores. *Id.* at 35-36, 38. Dickerson specifically noted his past diagnosis of schizotypal personality disorder, arguing that it was a "major mental illness" that posed a "significant and profound impediment to [his] ability to cooperate, rationally understand or communicate about, or even participate meaningfully in his own defense." *Id.* at 39.

Here, Dickerson likewise claims that he was not competent to stand trial. *See* Amended Petition [57], at 36-38. He asserts that at the time of his trial, he suffered from mental illness, brain damage, and intellectual disability. *Id.* at 37. In support of this claim, he cited a variety of medical records, the new affidavits from friends and family members, the new declaration provided by Dr. Grant, and the new affidavit from Dr. Lott. The medical records documented Dickerson's past treatment for mental illness and a head injury he suffered as a child. The affidavits from friends and family covered many of the same topics addressed above in the Court's discussion of

---

[13] Although Dickerson relied on Lott's testing and research, he disagreed with the conclusions that Lott drew from those facts. The Court has already discussed Dr. Lott's initial evaluation and testimony in the trial court.

Dickerson's *Atkins* claim. Numerous friends and family stated that Dickerson's family had a history of mental illness, and many of them mentioned times he had exhibited odd behavior. Dr. Grant noted the same mental health history cited by Dr. Lott. Exhibit 49 to Amended Petition [57-6], at 4, 8. Dr. Grant "highly recommend[ed] Mr. Dickerson be seen by a psychiatrist who can address issues of competency . . . ." *Id.* at 8. Also, although Dr. Lott still affirms that "Dickerson was competent when [he] evaluated him," he now also believes that Dickerson is "likely suffering from schizophrenia or a bipolar disorder with psychotic features." Exhibit 52A to Amended Petition [57-9], at 5. Dickerson admits, though, that this new evidence was all available at the time of his trial, although it was discovered in post-conviction and developed by his federal habeas counsel.

As explained above, "merely putting a claim in a stronger evidentiary posture is not enough" to make it a new, unexhausted claim. *Nelson*, 952 F.3d at 671. Rather, "new evidence that fundamentally alters the legal claim or places the claim in a significantly different legal posture can render it a new claim that was not adjudicated on the merits by the state court." *Id.* at 671-72. New evidence "fundamentally alters" a claim "where the petitioner provides substantial amounts of new evidence, the claims and allegations before the state court were conclusory and undeveloped, the petitioner offers new evidence that could not have been derived from the state court record, and the petitioner offers new evidence which alters the nature of his claims." *Sells*, 536 F. App'x at 491. In other words, "substantial new evidence rising to the level of a '180 degree turn' renders a claim unexhausted." *Anderson*, 338 F.3d at 389 n. 26.

Considering the record discussed above, the Court concludes that Dickerson's competency claim was not "conclusory and undeveloped" in state court. *Sells*, 536 F. App'x at 491. Although

Dickerson bolstered the claim with additional evidence, he has not altered it so much that it is a "180-degree turn" from the way he presented it in state court. *Anderson*, 338 F.3d at 389 n. 26. The state court competency claim and habeas competency claim are based on the same legal theory. Dickerson supported the state court competency claim with substantial evidence, including the testimony of friends, family, former employers, and experts. The evidence here varies in quantity, but not necessarily in quality. Indeed, the supplemental evidence – the family affidavits, Lott's affidavit, and Grant's affidavit – expands on factual issues already explored in state court, and it does not obviously strengthen the claim to the point of fundamental alteration. Moreover, neither Lott nor Grant have opined that Dickerson was not competent to stand trial. Instead, they just say more evaluation is needed, despite Dickerson having received two months of inpatient evaluation before his trial. For all these reasons, the Court finds that Dickerson supplemented the claim, rather than fundamentally altered it. Accordingly, the *Atkins* claim asserted in Ground 1 was exhausted. *See Ward*, 777 F.3d at 258-59; *Morris*, 413 F.3d at 494-97; *Lewis*, 541 F.3d at 285.

### 2.  *Ground 2b – Ineffective Assistance Related to Competency*

As for Ground 2's ineffective-assistance claim, in state court Dickerson argued that his counsel provided ineffective assistance by "fail[ing] to challenge the findings of state experts that [he] was competent to stand trial." *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 30, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). He asserted in state court that "[a]t a minimum, trial counsel had a duty to conduct a *Daubert* hearing to ensure that the findings of these experts met the minimum standards for admissibility." *Id.* Dickerson also argued to the Mississippi Supreme Court that his trial counsel were ineffective for failing to investigate and put on evidence regarding his abilities and life history

which – although he did not point this out in briefing – would be relevant to the determination of his competency in addition to the *Atkins* issue. *See* Petitioner's Rebuttal of State's Response to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 3-4, 7, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Sept. 25, 2020).

In this federal habeas case, Dickerson claims that his trial counsel "failed to conduct an adequate investigation prior to the competency evaluation;" "failed to select a competent, independent expert;" and "failed to review key mental health records prior to the competency hearing." Amended Petition [57], at 38-42.

The State argues that this claim is technically exhausted, as it would be barred by the statute of limitations and barred as a successive petition. In response, Dickerson argues that he has a right to present this claim to the Mississippi Supreme Court because his post-conviction counsel provided ineffective assistance by omitting it from his first post-conviction petition, citing *Grayson*. As the Court discussed earlier, any successive post-conviction petition presented to the Mississippi Supreme Court at this point would be time-barred, MISS. CODE ANN. § 99-39-5(2)(b), and barred as a successive petition. MISS. CODE ANN. § 99-39-27(9). To the extent *Grayson* provided an exception to these bars, the Mississippi Supreme Court recently overruled it. *Ronk*, 2024 WL 131639 at *4. Accordingly, the Court concludes that the Mississippi Supreme Court would hold that post-conviction relief is no longer available for the ineffective-assistance claim asserted in Ground 2b because it is procedurally barred, and Petitioner has not argued that any other exception to the statutory bars applies. Therefore, the claim is technically exhausted. *Jones*, 163 F.3d at 296.

C.      *Ground 4 – Ineffective Assistance in Mitigation*

In Ground 4, Dickerson claims that his trial counsel provided ineffective assistance by failing to adequately investigate, develop, and present mitigating evidence during the sentencing phase of trial. Amended Petition [57], at 50-64. In his petition for post-conviction relief, he argued that his trial counsel provided ineffective assistance by failing to conduct a thorough pretrial mitigation investigation. *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 30-33, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). The Mississippi Supreme Court addressed this issue on post-conviction. *Dickerson III*, 357 So. 3d at 1025-28.

Dickerson argues that the claim asserted in Ground 4 is factually distinct from the claim asserted in post-conviction. He contends that on post-conviction he generally alleged that his trial counsel was ineffective by failing to conduct a thorough pretrial mitigation investigation, while here he alleges that his trial counsel 1) failed to obtain an independent expert, 2) failed to provide the court-appointed expert with records documenting abuse in his past, 3) failed to provide the court-appointed expert mitigating evidence uncovered after the competency evaluation, and 4) failed to meet with the court-appointed expert before the penalty phase of trial and ask him to prepare mitigation testimony. Dickerson also argues that the claim is different because new evidence has "fundamentally altered" the claim.

In response, the State argues that Dickerson exhausted the claim asserted in Ground 4 by presenting it to the Mississippi Supreme Court in a post-conviction proceeding. The State also contends that, even if Dickerson had not already presented the claim to the Mississippi Supreme

Court for review, it would be technically exhausted because post-conviction relief is no longer available.

In his petition for post-conviction relief, Dickerson alleged that his trial counsel "fail[ed] to conduct [a] thorough pretrial mitigation investigation." *See* Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 30, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Oct. 14, 2016). He specifically complained of his trial counsel's failure to explore certain lines of questioning of his mitigation witnesses, and failure to call certain witnesses to provide mitigation testimony about his family life, work history, inability to perform household and work-related tasks, and childhood trauma. *Id.* at 31-33. He also specifically complained of counsel's failure to call his brother, Troy Dickerson, as a mitigation witness. *See* Petitioner's Rebuttal of State's Response to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief at 7, *Dickerson v. State*, No. 2015-DR-954-SCT (Miss. Sept. 25, 2020).

In support of the state-court claim, he presented affidavits from friends, family, and former employers, as the Court discussed above. They all asserted that Dickerson was unable to perform simple tasks without supervision. Troy Dickerson also discussed their family history and trauma they suffered as children. Troy said no one from Dickerson's defense team contacted him, but he would have testified if they had asked him to do so.

In this federal habeas case, Dickerson generally complains of his trial counsel's "fail[ure] to adequately investigate, develop, and present mitigating evidence at the penalty phase" of trial. Amended Petition [57], at 51. More specifically, he contends that his counsel 1) failed to provide the court-appointed psychologist with sufficient information to make a reliable assessment of his competency or intellectual disability, *id.* at 53; 2) failed to request that the court-appointed expert

provide a report addressing mitigation issues before the sentencing phase of trial, *id.* at 53-54; 3) failed to obtain an independent mitigation expert to testify at sentencing, *id.* at 54; 4) failed to provide the court-appointed expert with youth court records to supplement his report, *id.* at 55; and 5) failed to engage a mental-health expert to determine whether Dickerson suffered from PTSD, other mental illness, or neurological dysfunction, *id.* at 58.

In support of the habeas claim, Dickerson cited 1) Dr. Criss Lott's initial evaluation performed for the state trial court;[14] 2) Dickerson's medical records documenting his prior treatment for mental illness;[15] 3) school records demonstrating Dickerson's poor academic performance;[16] 4) social security records documenting Dickerson's mother's intellectual disability;[17] 5) affidavits from friends and family documenting the Dickerson family's history of mental illness, abuse, and addiction;[18] 6) Dr. Criss Lott's mitigation testimony from the penalty phase of trial;[19] 7) mitigation testimony from the penalty phase of trial by Dr. Julie Schroeder, a professor of social work retained to evaluate Dickerson's psychosocial history;[20] 8) Dickerson's youth court file, which contained allegations of child abuse and neglect;[21] 9) an affidavit and competency evaluation by Dr. Benjamin Root, a psychiatrist;[22] 10) an affidavit and evaluation by Dr. Malcolm Spica, a neuropsychologist;[23] and 11) testimony from Dr. Storer and Dr. McMichael from the state-court competency hearing.[24] Citing each of these sources, Dickerson focuses on his

---

[14] *See* Exhibit 4 to Amended Petition [11-4].
[15] *See* Exhibits 6-7 to Amended Petition [11-6, 11-7].
[16] *See* Exhibits 37-40 to Amended Petition [11-37, 11-38, 11-39, 11-40].
[17] *See* Exhibit 1 to Amended Petition [11-1].
[18] *See, e.g.* Exhibits 43, 45 to Amended Petition [11-43, 57-2].
[19] *See* Trial Record Vol. 9 [32-9], at 89-118.
[20] *See id.* at 142-52; Trial Record Vol. 10 [32-10], at 3-19.
[21] *See* Exhibit 2 to Amended Petition [11-2].
[22] *See* Exhibit 31 to Amended Petition [11-31].
[23] *See* Exhibit 35 to Amended Petition [11-35].
[24] *See* Trial Record Vol. 6 [32-6], at 100-18.

history of mental illness and his family history of mental illness, addiction, abuse, and poverty. He contends that his counsel could and should have presented a much more thorough mitigation case, and that if they had done so, there is a reasonable probability that at least one juror would have voted for a life sentence, rather than the death penalty.

As with the claims discussed above, Dickerson has not fundamentally altered the ineffective assistance claim asserted in Ground 4 of the Amended Petition from the version of it that he asserted in state court. Both the factual and legal basis of the claim are the same as the one asserted in state court; he still claims that his trial counsel provided ineffective assistance by not sufficiently investigating and supporting his mitigation case. *See Ward*, 777 F.3d at 258-59; *Richey*, 498 F.3d at 353. In this federal habeas case, Dickerson simply provided more specific examples of the alleged deficiencies in his counsel's representation and bolstered the claim with more evidence – much of which was always available to him in state court. As explained above, providing more evidence of similar quality to that provided in state court is not enough to fundamentally alter a claim. *See Nelson*, 72 F.4th at 659; *Ward*, 777 F.3d at 258-59; *Winston*, 592 F.3d at 550; *Morris*, 413 F.3d at 495-96; *Sells*, 536 F. App'x at 491. Moreover, the new evidence does not strengthen the claim so much that it is a "180-degree turn" from the way Dickerson presented it in state court. *Anderson*, 338 F.3d at 389 n. 26. Accordingly, the Court finds that the claim asserted in Ground 4 of the Amended Petition has, in fact, been exhausted.

Even if the claim had not been exhausted, it would be technically exhausted for the same reasons discussed above. Any successive post-conviction petition presented to the Mississippi Supreme Court at this point would be time-barred, MISS. CODE ANN. § 99-39-5(2)(b), and barred as a successive petition. MISS. CODE ANN. § 99-39-27(9). To the extent *Grayson* provided an

exception to these bars, the Mississippi Supreme Court recently overruled it. *Ronk*, 2024 WL 131639 at *4. Accordingly, the Court concludes that the Mississippi Supreme Court would hold that post-conviction relief is no longer available for the ineffective-assistance claim asserted in Ground 4 because it is procedurally barred, and Petitioner has not argued that any other exception to the statutory bars applies. Therefore, the claim is technically exhausted. *Jones*, 163 F.3d at 296.

**D.     *Summary***

For these reasons, the Court finds that the claims asserted in Grounds 1, 2, and 4 of the Amended Petition [57] have either been exhausted or technically exhausted.

## III. MOTION TO STAY AND ABEY [36]

Dickerson filed a Motion to Stay and Abey [36] this case so that he can pursue a successive petition for post-conviction relief with the Mississippi Supreme Court and exhaust his state-court remedies as to certain claims. The State argues that Dickerson cannot exhaust any federal ground for relief by presenting his unexhausted claims in state court, that his unexhausted claims have no merit, and that Dickerson is merely trying to delay the resolution of this case.

Dickerson argues that the following claims have not been exhausted by presentation in state court: 1) Ground 5's claim that his trial counsel provided ineffective assistance by failing to conduct an adequate guilt-phase investigation, retain experts to challenge the State's evidence, or otherwise counter the State's case; 2) Ground 6's claim that the trial court violated his right to a jury representing a fair cross-section of the community by excluding minors from the *venire*; 3) Ground 13's claim that the State failed to disclose exculpatory evidence; 4) Ground 15's claim that trial counsel provided ineffective assistance because of a conflict of interests; and 5) Ground 16's claim

that trial counsel provided ineffective assistance by failing to question jurors about their relationships with law enforcement.[25]

As noted above, "[t]he point of AEDPA . . . is to require prisoners first to exhaust state court remedies before seeking federal relief . . . ," *Broadnax*, 987 F.3d at 406, and a federal habeas petitioner "must exhaust all claims in state court prior to requesting federal collateral relief." *Smith*, 515 F.3d at 400; *see also* 28 U.S.C. § 2254(b)(1)(A). Generally, district courts should dismiss mixed petitions – habeas petitions that include both exhausted and unexhausted claims. *Strickland v. Thaler*, 701 F.3d 171, 174 (5th Cir. 2012). However, "because exhaustion is based on comity rather than jurisdiction, there is no absolute bar to federal consideration of unexhausted habeas applications." *Id.* A district court may deny an unexhausted claim on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Id.*

District courts also have discretion to stay a habeas case with a mixed petition, to allow the petitioner to present his unexhausted claims to the state court and later return to federal court for review of his perfected petition. *Rhines*, 544 U.S. at 274-79. Such stays should only be available in "limited circumstances," where "the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.* at 277. "[E]ven if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Id.* Finally, mixed petitions "should not be stayed indefinitely." *Id.* The Court should impose "reasonable time limits" on the trip back to state court, and "condition the stay" on the petitioner actually pursuing the unexhausted claims in state court within a brief interval of the stay being granted. *Id.* at 278.

---

[25] As the Court explained above, the claims asserted in Grounds 1, 2, and 4 have either been exhausted or are technically exhausted. Therefore, the Court will disregard them in its discussion of Dickerson's Motion to Stay [36].

In summary, "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics," then "the district court should stay, rather than dismiss, the mixed petition." *Id.* If the Court determines that a stay is not merited, it "should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.*

## A.    *Good Cause*

"There is little authority on what constitutes good cause to excuse a petitioner's failure to exhaust." *Blake v. Baker*, 745 F.3d 977, 980 (9th Cir. 2014). The Supreme Court has suggested that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court." *Pace v. DiGuglielmo*, 544 U.S. 408, 416, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005). One Court of Appeals has held that "good cause turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence, to justify" the failure to exhaust. *Blake*, 745 F.3d at 982. "An assertion of good cause without evidentiary support will not typically amount to a reasonable excuse justifying a petitioner's failure to exhaust." *Id.* At least two Courts of Appeals – including the Fifth Circuit – have described "good cause" as an "equitable" standard. *See Ruiz v. Quarterman*, 504 F.3d 523, 529 n. 17 (5th Cir. 2007); *Blake*, 745 F.3d at 982.

District courts in the Fifth Circuit have found "good cause" for failing to exhaust where 1) the petitioner was ignorant of his obligation to exhaust claims, and a dismissal would have prevented him from returning to federal court because of AEDPA's statute of limitations;[26] 2) a

---

[26] *Walker v. Lumpkin*, Civil No. H-20-3501, 2022 WL 2239851, at *7 (S.D. Tex. June 22, 2022).

petitioner alleged difficulty in hiring an attorney and refiling would be precluded because of AEDPA's statute of limitations;[27] 3) petitioner's unexhausted claim arose from a retroactively applied change in applicable law;[28] 4) the "legal landscape" surrounding petitioner's claim was "confusing and ambiguous" during the time that petitioner pursued his initial state post-conviction proceedings;[29] 5) the state appellate court effectively instructed petitioner to not raise claims of ineffective assistance of trial counsel on post-conviction;[30] 6) the state appellate court would not consider claims of ineffective assistance of trial counsel;[31] and 7) the petitioner alleged and provided evidence of ineffective assistance by post-conviction counsel in failing to exhaust claims.[32]

Courts in other jurisdictions have found "good cause" for a stay where 1) the petitioner provided evidence of ineffective assistance of state post-conviction counsel;[33] 2) the petitioner had no counsel in his state post-conviction proceeding;[34] 3) an outright dismissal would jeopardize the timeliness of the petitioner's habeas petition as to the unexhausted claims;[35] 4) the petitioner's counsel discovered undisclosed *Brady* evidence after petitioner had already filed his federal habeas petition;[36] 5) the petitioner did not become aware of the factual basis of a claim until after the conclusion of his state post-conviction proceeding, and he had exercised due diligence in

---

[27] *Brown v. Davis*, No. 3:18-CV-174-NBB-DAS, 2021 WL 2907889, at *4 (N.D. Miss. July 9, 2021).
[28] *Folse v. Kent*, Civil No. 18-121-BAJ-SDJ, 2020 WL 7753075, at *1-*2 (M.D. La. Dec. 29, 2020).
[29] *Cade v. Lumpkin*, No. 3:17-CV-3396-G-BT, 2020 WL 4877586, at *1 (N.D. Tex. Aug. 19, 2020).
[30] *Maize v. Louisiana*, Civil No. 18-9393, 2019 WL 2469678, at *4 (E.D. La. June 13, 2019).
[31] *Thompson v. Hooper*, Civil No. 17-11674, 2018 WL 2013105, at *4 (E.D. La. Apr. 30, 2019); *Quinn v. Hooper*, Civil No. 21-1779, 2022 WL 671846, at *3 (E.D. La. Mar. 7, 2022).
[32] *Irish v. Cain*, Civil No. 15-480, 2023 WL 2564397, at *2 (W.D. La. Mar. 16, 2023).
[33] *Blake*, 745 F.3d at 983; *Thompson v. Radtke*, No. 22-CV-15-JPS, 2022 WL 1156153, at *2 (E.D. Wis. Apr. 19, 2022).
[34] *Dixon v. Baker*, 847 F.3d 714, 720 (9th Cir. 2017).
[35] *Randall v. Superintendent Mahanoy SCI*, 835 F. App'x 675, 677 (3rd Cir. 2020).
[36] *Eakes v. Sexton*, 593 F. App'x 422, 431 (6th Cir. 2014).

developing the pertinent facts;[37] and 6) the petitioner's failure to exhaust was attributable to the prosecution's wrongful withholding of information.[38]

Dickerson contends that his failure to exhaust is attributable to ineffective assistance provided by his post-conviction counsel. Under federal law, there is no right to effective post-conviction counsel. *See, e.g. Coleman*, 501 U.S. at 752; 28 U.S.C. § 2254(i). At least one Court of Appeals has held that ineffective assistance of post-conviction counsel can constitute good cause for a stay under *Rhines*. *See Blake*, 745 F.3d at 983.[39] However, the Fifth Circuit has recently held that the ineffective assistance of state post-conviction counsel does not constitute good cause for a *Rhines* stay. *Tong v. Lumpkin*, 90 F.4th 857, 863 (5th Cir. 2024) (citing *Williams v. Thaler*, 602 F.3d 291, 309 (5th Cir. 2010), *abrogated on other grounds by Thomas v. Lumpkin*, 995 F.3d 432, 440 (5th Cir. 2021)).[40] Therefore, the alleged ineffective assistance of Dickerson's post-conviction counsel does not constitute good cause for a *Rhines* stay. Even if it did, a stay would still be unavailable under *Rhines* because Dickerson's unexhausted claims are plainly meritless, as explained below.

## C.    *Plainly Meritless Claims*

"[E]ven if a petitioner had good cause for [his failure to exhaust], the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines*, 544 U.S. at 277. "In determining whether a claim is 'plainly meritless,'

---

[37] *Cunningham v. Hudson*, 756 F.3d 477, 486 (6th Cir. 2014).

[38] *Jalowiec v. Bradshaw*, 657 F.3d 293, 304-05 (6th Cir. 2011).

[39] To clarify, Mississippi law provides that death-sentenced prisoners have a right to effective post-conviction counsel, *Grayson*, 118 So. 3d at 126, but that right does not overrule the statutory bars to asserting such claims in a post-conviction petition. *Ronk*, 2024 WL 131639 at *4. There is no federal right to effective assistance of post-conviction counsel, *Coleman*, 501 U.S. at 752, but some federal courts have found that ineffective assistance of post-conviction counsel can provide good cause for a stay under *Rhines*. *See, e.g. Blake*, 745 F.3d at 983.

[40] *See also Guevara-Pontifes v. Baker*, No. 3:20-CV-652-ART-CSD, 2022 WL 4448259, at *4 (D. Nev. Sept. 23, 2022) (questioning whether post-conviction counsel's ineffective assistance could still provide good cause for a *Rhines* stay after *Shinn v. Ramirez*, 596 US. 366, 142 S. Ct. 1718, 212 L. Ed. 2d 713 (2022), and *Shoop v. Twyford*, 596 U.S. 811, 142 S. Ct. 2037, 213 L. Ed. 2d 2037 (2022)).

principles of comity and federalism demand that the federal court refrain from ruling on the merits

of the claim unless it is perfectly clear that the petitioner has no hope of prevailing." *Dixon*, 847

F.3d at 722. The Court must not "deprive state courts of the opportunity to address a colorable

federal claim in the first instance and grant relief if they believe it is warranted." *Id.*

       *1.*       *Ineffective Assistance re: Guilt-Phase Investigation*

Dickerson argues that Ground 5 – that his trial counsel provided ineffective assistance by

failing to conduct an adequate guilt-phase investigation – is not plainly meritless. Specifically, he

contends that his counsel should have contacted witnesses who saw him on the day of the murder

and could testify as to his whereabouts and state of mind on the day of the crime; that counsel

should have retained an expert to testify that his mental disorders rendered him incapable of

forming the specific intent necessary to commit the charged crimes; and that counsel should have

retained DNA, ballistics, and eyewitness identification experts.

"[A] criminal defendant's Sixth Amendment right to counsel is denied when a defense

attorney's performance falls below an objective standard of reasonableness and thereby prejudices

the defense." *Guidry v. Lumpkin*, 2 F.4th 472, 488 (5th Cir. 2021). In applying this standard, the

court "must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052,

80 L. Ed. 2d 674 (1984). The Court's analysis must not be distorted by hindsight. *Moore v.

Quarterman*, 534 F.3d 454, 468 (5th Cir. 2008). "Conclusory allegations" of prejudice are not

sufficient; rather, "the defendant must affirmatively prove prejudice." *Tuesno v. Cain*, 198 F.3d

242, 1999 WL 824557, at *3 (5th Cir. Oct. 7, 1999). "Absent a showing that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, the defendant's [ineffective assistance] claim will fail." *Id.*

"[T]o succeed on a claim for failure to investigate, a defendant must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Bernard*, 762 F.3d 467, 477 (5th Cir. 2014). "Further, an attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Id.* Likewise:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *see also Robinson v. Whitley*, 2 F.3d 562, 571 (5th Cir. 1993) ("general allegations and speculation" were not sufficient to support ineffective assistance claim); *Rivers v. Lumpkin*, 2022 WL 1517027, at *4-*5 (5th Cir. May 13, 2022) (petitioner presented no admissible evidence to support ineffective assistance claim based on counsel's failure to call witnesses in trial court).

Dickerson identified no specific evidence or factual allegations which adequately support the claim that his trial counsel should have contacted certain witnesses or retained expert witnesses. He did not identify any specific guilt-phase witnesses that should have been called or set out the contents of the proposed witnesses' testimony. He did not present any evidence or

specific factual allegations demonstrating that state of mind, DNA,[41] ballistics, or eyewitness identification experts would have been favorable to his defense. Rather, this claim is premised upon conclusory allegations and speculation, which are insufficient to state a colorable habeas claim. *Woodfox*, 609 F.3d at 808; *Tuesno*, 1999 WL 824557 at *3; *Robinson*, 2 F.3d at 571; *United States v Israel*, 838 F. App'x 856, 866 (5th Cir. 2020) (where defendant presented no evidence that trial counsel could have obtained desired testimony from an expert, he could not prevail on claim of ineffective assistance for failure to investigate).

Additionally, the Fifth Circuit has declined to address whether "diminished capacity evidence is admissible to defeat the mental state requirement of a specific intent crime," *United States v. Eff*, 524 F.3d 712, 720 n. 11 (5th Cir. 2008), and "Mississippi does not recognize the defense of diminished capacity short of *M'Naughten* insanity, even to negate intent." *Stevens v. Epps*, 2008 WL 4283528, at *20 (S.D. Miss. Sept. 15, 2008) (citing *Cannaday v. State*, 455 So. 2d 713, 720 (Miss. 1984)). The Court finds that this claim is plainly meritless. *Clark v. Arnold*, 769 F.3d 711, 726 (9th Cir. 2014) (counsel was not ineffective for failing to offer expert testimony regarding intent where state law arguably barred such evidence when offered to negate *mens rea*); *Manchas v. Superintendent of SCI Huntingdon*, 428 F. App'x 184, 188 (3rd Cir. 2011) (petitioner failed to demonstrate ineffective assistance where he did not demonstrate that hypothetical expert testimony on his intent would have been helpful to his defense).

### 2.    *Ineffective Assistance – Conflict of Interests*

Next, Dickerson argues that Ground 15 – that his trial counsel provided ineffective assistance of counsel due to a conflict of interests – is not plainly meritless. Specifically, Dickerson

---

[41] Dickerson has never asserted an actual innocence claim, and he does not do so here.

contends that one of his trial counsel, M. A. Bass, had previously represented the victim, Paula Hamilton, in a custody dispute against him in 1996, approximately sixteen years prior to the murder trial.[42] Dickerson argues that Bass's representation of him in the capital murder case was materially limited by the duty to not use or reveal any information gained through his previous representation of Ms. Hamilton in the custody matter.

To prevail on an ineffective-assistance claim premised upon an alleged conflict of interests, Dickerson must "show that his trial attorney was acting under the influence of an actual conflict of interests that adversely affected his performance at trial." *United States v. Infante*, 404 F.3d 376, 391 (5th Cir. 2005). "An actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *McHenry v. Texas*, 826 F. App'x 352, 355 (5th Cir. 2020). Dickerson need not demonstrate "that the outcome of the proceeding would have been different if it were not for his attorney's conflict of interest." *Infante*, 404 F.3d at 391. Rather, he must demonstrate that the "conflict adversely affected the representation *itself*." *United States v. Shepherd*, 27 F.4th 1075, 1083 (5th Cir. 2022). "To show adverse effect, a petitioner must show that some plausible defense strategy or tactic might have been pursued but was not, because of the conflict of interest." *McHenry*, 826 F. App'x at 355.

Even if the Court assumes that Dickerson has alleged an actual conflict, he has not alleged any facts demonstrating that the conflict adversely affected the representation provided by his trial counsel. First, Bass was only one member of a team of attorneys with substantial experience in

---

[42] As the Court previously noted, Dickerson was represented at the murder trial by a team of attorneys from the Office of the State Public Defender who have substantial expertise and experience in representing criminal defendants in capital cases.

capital defense. Regardless, Dickerson has not identified any specific material information that Bass gained through the previous representation of Ms. Hamilton that could have been utilized in the capital murder trial, or that Bass refrained from using during the murder trial. Indeed, Dickerson has not articulated *any way* in which Bass's previous representation of Hamilton in the custody dispute affected the representation provided by his defense team in the murder trial. Like Dickerson's other claims, this one is based on conclusory allegations, speculation, and conjecture. That is not enough to state a colorable habeas claim. *Tuesno*, 1999 WL 824557 at *3; *Robinson*, 2 F.3d at 571. Accordingly, the Court finds that this claim is plainly meritless. *McHenry*, 826 F. App'x at 355-56 (petitioner failed to demonstrate that a conflict affected representation where his claims were "entirely speculative").

### 3. *Other Claims*

Finally, Dickerson listed other claims in his briefing that he asserts are not plainly meritless. In Ground 6, he claims that his right to a jury representing a fair cross-section of the community was violated because the trial court excluded persons between the ages of eighteen and twenty-one from the jury pool. "In the absence of specific binding precedent prohibiting the exclusion of a specific group of individuals as violative of the fair cross-section requirement of the Sixth Amendment," this Court is prohibited from granting habeas relief on this basis. *Murphy v. Johnson*, 205 F.3d 809, 818 (5th Cir. 2000) (citing *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989); *Wilkerson v. Whitley*, 28 F.3d 498, 508 (5th Cir. 1994) (en banc)). Dickerson has not cited any specific binding precedent prohibiting the exclusion of 18-21 year-olds from a jury pool.

In Ground 13, Dickerson claims that the prosecution failed to disclose exculpatory evidence. "Under *Brady*, the Government violates a defendant's due process rights if it withholds

evidence that is favorable to the accused and material to the defendant's guilt or punishment." *United States v. Hankton*, 51 F.4th 578, 602 (5th Cir. 2022). To prove a *Brady* violation, a defendant must prove three things: "First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the Government must have suppressed the evidence. Third, the defendant must have been prejudiced." *Id.* at 602-03. Dickerson has not alleged or provided evidence that the State allegedly withheld any specific evidence that would have been favorable to his defense or that the State's withholding it prejudiced him in any way. Rather, he generally refers to "the notes and underlying information relied upon by the MS Crime Lab and other investigative agencies," without identifying the contents of such documents or even affirming their existence. Amended Petition [57], at 109.

In Ground 16, Dickerson claims that his trial counsel provided ineffective assistance by failing to question potential jurors about their relationships with law enforcement. "Counsel is . . . accorded particular deference when conducting *voir dire*. An attorney's actions during *voir dire* are considered to be matters of trial strategy," and "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (5th Cir. 2001). Dickerson has not alleged facts demonstrating that his trial was permeated with "obvious unfairness," *id.*, or that there is a reasonable probability that the outcome of the trial would have been different if his counsel had questioned the jury pool more about their relationships with law enforcement. To be sure, each potential juror was provided a questionnaire which asked whether they "or any family member or close personal friend ever worked as a volunteer or employee in a law enforcement agency, prosecutor's office, prison, jail, correctional institution or

mental health facility," Trial Record Vol. 4 [32-4], at 108, but Dickerson did not cite any of the questionnaires returned by the empaneled jurors.

Moreover, to demonstrate actual juror bias, "admission or factual proof of bias must be presented," and Petitioner has not alleged any specific facts demonstrating actual bias. *Buckner v. Davis*, 945 F.3d 906, 911 (5th Cir. 2019). As for implied juror bias, the Fifth Circuit has questioned whether there is any "clearly established" constitutional doctrine of implied bias. *Uranga v. Davis*, 893 F.3d 282, 288 (5th Cir. 2018). Regardless, Petitioner vaguely alleged that four jurors "related to law enforcement ended up on the jury." Amended Petition [57], at 118. He claims one juror was "related to Hazlehurst Chief of Police, Byron Swilley," without identifying the degree of relation or alleging that it had any impact on the juror's deliberations. *Id.* He claims another juror "had two sons who worked in law enforcement, one of whom worked for the Copiah County Sheriff's Office and the State Fire Marshal's Office, both entities that investigated the crime, while the crime was being investigated," but he did not allege that the son worked on this case, had any knowledge of it, or that his employment had any bearing on his mother's service as a juror. *Id.* Petitioner has not cited any Fifth Circuit case law indicating that relationships such as these are sufficient to impute bias to a juror.

Finally, Dickerson provided no argument in support of these claims (Grounds 6, 13, and 16) in his briefing, and, therefore, the Court finds that he has not demonstrated that they are potentially meritorious. *United States v. Barnes*, 953 F.3d 383, 389 (5th Cir. 2020) (party waived argument by "only briefly alluding" to it in briefing); *United States v. Rojas*, 812 F.3d 382, 413 (5th Cir. 2016) (by failing to brief a specific argument, defendant waived it).

**IV. CONCLUSION**

For the reasons provided above, the Court finds that the claims asserted in Grounds 1, 2, and 4 of the Amended Petition have either been exhausted or are technically exhausted. The Court further finds that Petitioner David Dickerson has not provided good cause for a stay, and that his unexhausted habeas claims are plainly meritless. Therefore, the Court **denies** his Motion to Stay and Abey Federal Proceedings Pending Resolution of Successor Petition in State Court Regarding Unexhausted Grounds for Relief [36].

"[I]f a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to federal relief." *Rhines*, 544 U.S. at 278. Therefore, the Court orders Dickerson to file a Second Amended Petition which omits the unexhausted claims on or before **March 27, 2024**. The Court does not authorize Dickerson to otherwise amend his petition. If Dickerson does not file a Second Amended Petition which omits the unexhausted claims, then the Court may dismiss the entire petition without additional notice.

The Court previously appointed Stacy Ferraro and Talia MacMath as counsel to represent Dickerson in this matter pursuant to 18 U.S.C. § 3599, authorizing them to seek compensation as provided by the CJA. Ms. Ferraro then briefly left the private practice of law, and the Court appointed her in her capacity as an employee of the Federal Public Defender for the Southern District of Mississippi. Now, Ms. Ferraro has resumed private practice and filed a Motion for Appointment of Counsel [64], seeking reappointment in her individual capacity. The Court **grants**

the motion [64] for the same reasons and subject to the same terms as its previous appointments of Ms. Ferraro in this case.

Compensation for McMath and Ferraro will be at the maximum rate authorized by the Judicial Conference when the work is performed, and counsel has leave to submit interim vouchers. This appointment applies only to Ferraro and MacMath and includes no other attorneys without the express prior authorization of the Court. To prevent unnecessary duplication of work, Ms. Ferraro will serve as lead counsel and monitor the joint work in this case.

All requests for reimbursement and compensation should be submitted through the Court's eVoucher system. Payment will be determined in accordance with CJA procedures in effect in this District,[43] the Judicial Council of the Fifth Circuit's Plan for Representation on Appeal Under the Criminal Justice Act,[44] and the Fifth Circuit's CJA Voucher Submissions Instructions and Policies.[45]

If a budget is submitted and approved by the District Judge and the Chief Judge of the Fifth Circuit in advance, then vouchers for attorneys' fees and other expenditures up to the budgeted amount may be approved and paid in this Court. To comply with these procedures and to prevent delay in compensating appointed attorneys, the Court orders Dickerson's counsel to submit a budget request to the Court which includes both the hours already expended since January 1, 2024, and the estimated fees and expenses to be incurred from now until the filing of Petitioner's final rebuttal memorandum of law. The proposed budget must be submitted *ex parte* on or before **March 27, 2024**. The Court encourages counsel to consult the Fifth Circuit's CJA Case Budgeting

---

[43] *See* https://www.mssd.uscourts.gov/criminal-justice-act.
[44] *See* https://www.ca5.uscourts.gov/attorneys/cja/cja-plan.
[45] *See* https://www.ca5.uscourts.gov/attorneys/cja/cja-policies.

Attorney for assistance in preparing a budget. This Court's Death Penalty Law Clerk is also available to assist counsel.

In summary, the Court rules as follows:

- The claims asserted in Grounds 1, 2, and 4 of the Amended Petition have either been exhausted or are technically exhausted.

- The Court **denies** Dickerson's Motion to Stay and Abey Federal Proceedings Pending Resolution of Successor Petition in State Court Regarding Unexhausted Grounds for Relief [36].

- Dickerson's counsel shall submit a proposed budget *ex parte* on or before **March 27, 2024**.

- The Court **grants** the Motion for Appointment of Counsel [64] filed by Stacey Ferraro.

- Dickerson shall file a second amended petition, omitting his unexhausted claims, on or before **March 27, 2024**. If Dickerson fails to file a second amended petition as ordered, the Court may dismiss this case without further notice.

- The State shall file an answer to the second amended petition on or before **April 26, 2024**.

- Dickerson may file a rebuttal pleading on or before **May 10, 2024**.

- Dickerson shall file a memorandum of law in support of the second amended petition on or before **August 8, 2024**.

- The State shall then file a memorandum of law opposing the second amended petition on or before **October 7, 2024**.

- Dickerson may then file a rebuttal memorandum on or before **November 6, 2024**.

THIS, the 26th day of February, 2024.

_____/s/ Taylor B. McNeel_____
TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE